DAVID L. GEMMEL V. EDMOND C. FLETCHER.

No. 15,142.   (92 Pac. 713.)

SYLLABUS BY THE COURT.

1. FRAUD—*Husband and Wife—Land Not Devised by Reason of a Verbal Promise—Constructive Trust.*  Where a husband holds the legal title to real estate which belongs to his wife, and, to prevent the wife, when near the end of her last illness, from making a will for the purpose of devising the real estate to another, promises her to convey the real estate to such other, and the wife, relying upon such promise, does not make the will, and dies on the next day, the refusal of the husband to make the conveyance constitutes such fraud as will create a constructive trust which may be enforced in an equitable action for that purpose.

2. —— *Scope of the Trust.*  In such an action the trust will attach to whatever property the wife refrained from devising on account of the promise of the husband.

Error from Johnson district court; WINFIELD H. SHELDON, judge.  Opinion filed November 9, 1907.  Affirmed.  Opinion denying a petition for a rehearing filed January 11, 1908.

STATEMENT.

THIS suit was commenced by the defendant in error in the district court of Johnson county, July 20, 1904, for the purpose of establishing a trust upon certain real estate, and to compel conveyance thereof in compliance with such trust.  Upon the trial the court made findings of fact which read:

"FINDINGS OF FACT.

"(1) The real property in controversy in this action is a part of a tract of about 33,000 acres of Shawnee Indian land in Johnson county, Kansas, known as the 'Black Bob tract,' the patents therefor having been issued to the Indians about the year 1867, and containing a provision 'that the land should never be sold or conveyed by the grantees, etc., without the consent of the secretary of the interior for the time being.'

"The land in controversy is described as the south

half of the northeast 1-4 of section 6-14-25 (known as the north eighty) and the undivided half of the south half of the southeast quarter of said section 6-14-25 (known as the south eighty) one hundred and twenty acres, all in Johnson county, Kansas.

"(2) About the year 1867 persons in search of land and homes began to settle on this Black Bob tract and cultivate and improve the lands; and this continued until·there were about three hundred squatters, or settlers as they were called, on different portions of said land.

"These settlers did not have the legal title to said land and did not have any other right thereon, except what was known as a settler's or squatter's right. They were liable to be removed from said lands by the general government, until the passage of a resolution by congress about the year ——, known as 'the protection clause,' the effect of which was to prevent the government officials removing said settlers from the land occupied by them until an order of court was made therefor.

"About the year 1867 these Black Bob lands were purchased from the Indians by persons called and designated as speculators, and their deeds from the Indians were not approved until in April, 1884.

"(3) The settlers on these lands, being desirous of holding the tracts improved by them, organized, and maintained an organization, and kept an agent—one Thomas J. Slaughter—at Washington much of the time for about fifteen years, to protect as far as possible their possession and occupancy of said land and their improvements thereon, and to prevent the approval of the deeds from the Indians to the speculators.

"These settlers held frequent meetings, selected officers and committees, and made a persistent and determined effort to maintain their settlers' rights and prevent the speculators obtaining an approval of the deeds held by them, and through their efforts 'the protection clause,' heretofore mentioned, and the compromise hereinafter referred to were brought about.

"David L. Gemmel, the defendant in this action, and Irvin Fletcher, father of the plaintiff, were each settlers on different portions of said Black Bob tract, and they both attended the meetings of the settlers.

"(4) Pending this controversy and strife between the settlers and speculators, a suit was commenced in

the United States circuit court for the district of Kansas, in which the United States of America was complainant, and the Black Bob band of Shawnee Indians, the speculators, who held unapproved deeds from the Indians to said lands, and a great number of the settlers on said lands were parties.

"Pending this action a compromise settlement was agreed to and made by and between the parties representing the settlers and the parties representing the speculators, and consented to by the parties representing the Indians and the general government.

"This agreement and compromise, which was carried out, was, in substance, that the deeds from the Indians to the speculators to the Black Bob lands were to be approved, and the settlers on said lands were granted the first privilege or right to a deed to the land or lands upon which he or she was a settler, by paying therefor to the speculator holding the Indian deed to such land or lands an average price of ten dollars per acre and thereby protect himself or herself against loss and enabling the settlers to retain and hold their homes and improvements.

"Upon said compromise being effected a decree was rendered in said action in the United States circuit court, and, so far as affects the land in controversy in this action, J. C. Irwin, J. H. Gilpatrick and Nancy C. Blunt were found to be the owners and entitled to have their deeds from the Indians approved; and in pursuance of said compromise they conveyed the lands to one M. E. Clark, and M. E. Clark and wife made deeds to the settlers that desired to avail themselves of the right or privilege so obtained through said compromise.

"An appraisement or valuation of these lands was made, and also a map or plat; the deeds were acknowledged in blank at Leavenworth, Kan., by M. E. Clark and wife, and brought to Olathe, Kan., and the settlers notified, and when they came into Olathe to get their deeds the deeds were filled out and delivered to them.

"(5) During the long strife between the speculators and settlers some of these claims or tracts of land changed hands, the original squatter selling out to some one else, so that this squatter's or settler's right, as it was termed, was transferred from one to another, each one in turn becoming what was known as a settler; and these claims had a market value and were some-

times conveyed by deed from one squatter or settler to another.

"(6) The plaintiff, Edmond C. Fletcher, was born in 1868. His father, Irvin Fletcher, then lived as a settler on the south half of the southeast quarter of section 6-14-25 (known as the south eighty), and he lived there until his death, September 30, 1878, cultivating and improving the same, and at his death he had a house about half completed thereon that cost in the neighborhood of two thousand dollars.

"Irvin Fletcher died intestate, and left surviving him as his sole heirs his son, Edmond, and his widow, Sarah Fletcher, the step-mother of plaintiff.

"In 1875 or 1876, Irvin Fletcher and his wife, Sarah, bought of a settler by the name of Cook his settler's claim to the south half of the northeast quarter of said section 6-14-25 (known as the north eighty).

"Mr. and Mrs. Fletcher both had money invested in this north eighty, but in what proportion is not shown by the testimony; the deed from Cook was not recorded; it has been destroyed by fire, and the testimony does not disclose whether it was made to one or both of them.

"(7) At the time of his death Irvin Fletcher claimed to own the south eighty, and he and his wife claimed to own the settler's right to the north eighty, above described, and after his death his widow continued in the possession of both tracts, cultivating, improving and renting the same, and receiving the profits therefrom, until she married David L. Gemmel, defendant in this action, in 1880. After her marriage to David L. Gemmel she, with his assistance, continued to look after the renting of portions of the lands, and defendant Gemmel farmed a portion of said land.

"For a few years after their marriage Mr. and Mrs. Gemmel resided on land belonging to Mr. Gemmel near Stanley, Johnson county, Kansas, and David L. Gemmel purchased of the guardian of Edmond C. Fletcher the undivided half of the south eighty, and paid therefor the sum of twelve hundred and fifty dollars, and Gemmel and wife then moved on said south eighty and resided there until 1903, when they moved to Olathe, Kan., where they resided until the death of Mrs. Gemmel, January 21, 1904.

"(8) While Mr. and Mrs. Gemmel were living as husband and wife Mr. Gemmel made some improve-

ments on both eighties, in all amounting to about two thousand dollars, and most of which was on the south eighty, on which they lived and of which he had bought a half interest.

"(9) The evidence does not disclose that there was any accounting had or made between Mr. and Mrs. Gemmel as to the improvements or rents and profits arising from the use of said lands.

"(10) The guardian of Edmond C. Fletcher did not sell any part of the north eighty. Mrs. Gemmel claimed that, and when hedge posts were cut thereon and sold she claimed the money for which they were sold. She never sold what she claimed to be her interest in either of said eighties, and defendant Gemmel never had or held exclusive possession of either of said tracts as against her.

"(11) David L. Gemmel and his wife, Sarah, were both industrious and frugal people, and both had money and means and seemed to have taken care of the same, and this is true during their entire married life, and they each kept portions of their money under their separate and individual control.

"(12) After the death of his father, plaintiff, Edmond C. Fletcher, lived with his step-mother for a short time, then went to live with his guardian, and after a time again made his home with his step-mother; she had no children, was kind to him, and a feeling of friendship existed between them almost akin to that of mother and son, which lasted until about 1902, when they had a disagreement, which, however, was reconciled before her death.

"(13) Mrs. Sarah Gemmel died intestate, leaving as her heir at law David L. Gemmel, the defendant in this action.

"(14) I am unable to find from the evidence the exact terms of the agreement between Mr. and Mrs. Gemmel as to his procuring a deed for her from the speculator. I do find from the evidence that after the compromise between the settlers on the Black Bob lands and the speculators holding unapproved Indian deeds (referred to in the fourth finding of fact) had been effected, and the decree in the United States circuit court rendered, and on or about the 31st day of March, 1884, David L. Gemmel, the defendant in this action, went to Olathe, Kan., to procure for his wife, Sarah Gemmel, from the speculator holding such un-

approved Indian deed or deeds, a deed to all the land now claimed by the plaintiff in this action, and then claimed by her as a settler, as well as to procure for himself a deed to and for certain lands claimed by him as a settler; and he then and there procured from M. E. Clark, to whom the speculator had conveyed (as shown by finding of fact number four), and his wife, a deed to himself, which purported and purports to convey to David L. Gemmel 320 acres of said Black Bob tract of Indian land by pertinent description; the consideration paid by him to the agent or attorney of M. E. Clark, as shown by the deed, was $3200, or ten dollars an acre.

"Included in the lands described in said deed is the south half of the southeast quarter of section 6-14-25 (known as the south eighty) and the south half of the northeast quarter of section 6-14-25 (known as the north eighty).

"(15) At the time David L. Gemmel received the deed referred to in the fourteenth finding of fact the north eighty was of the reasonable value per acre of thirty dollars, and the south eighty was of the reasonable value of forty dollars per acre, which included improvements thereon and the settler's privilege of purchasing.

"(16) At the time he accepted said deed from M. E. Clark and wife David L. Gemmel knew that Sarah Gemmel, his wife, claimed and had a first right or privilege as a settler to purchase such part of the land included in the description in the deed to him as she then held as a settler (being the land now claimed by the plaintiff in this action) at an average price of ten dollars per acre; and knew that her first and prior right or privilege to purchase said land as a settler constituted and was a part of the actual price and consideration by which the deed could be and was obtained by him; and he was thereby, and only because thereof, enabled to obtain said deed to said land at that time by paying ten dollars per acre and availing himself of her prior right and privilege as a settler on said land to purchase the same as a settler under the compromise agreement referred to in finding of fact No. 4.

"(17) When David L. Gemmel went to Olathe to procure a deed for his wife to the land she claimed as a settler (the land in controversy in this action), and

when he accepted said deed, he did not intend to take a deed therefor to himself to such land as she claimed as a settler, but intended to take the deed therefor to her, and through a mistake in drawing up the deed it was made to him; he intended at that time to correct the mistake and make a deed to her, but neglected to do so.

"At the time that he procured said deed he did not claim to own the land in controversy in this action that she claimed as a settler; and after receiving said deed he did not claim the land as his, and during her lifetime he frequently spoke of the land as 'her land,' and even after her death spoke of it as 'her land.'

"(18) At the time David L. Gemmel obtained the deed from M. E. Clark and wife Mrs. Gemmel had money sufficient to pay for the land she claimed as a settler; but it does not appear from the evidence that David L. Gemmel used any of her money in paying for the deed.

"(19) I am unable to find from the evidence that Mrs. Gemmel ever had actual notice or knowledge that the deed from M. E. Clark and wife was made to her husband instead of to her.

"(20) At the time of Mrs. Gemmel's death the north eighty was worth and of the reasonable market value of $85 per acre and the south eighty was worth and of the reasonable market value of $100 per acre.

"(21) Mrs. Sarah Gemmel died January 21, 1904. She called the defendant, David Gemmel, to her bedside on the afternoon of January 20, 1904, and, she then being of sound mind, said to him, 'David, I cannot die easy feeling that Ed will not get my land down there or its value in money.' Mr. Gemmel replied, 'We might give him the money in the bank.' She said, 'No, that is not enough; why there is only ———— and a part of that was my father's; I would rather he had my land ————. I know he has not treated me just right, but it was his father's, and belongs to him by rights; but, if you don't want to tear it up now, I want you to give him its value in money, for I want Ed to have the land or its value in money; if you won't promise to do this, I will have to make a will,' to which Mr. Gemmel replied, 'Very well, don't worry, I will do that.'

"(22) That to prevent his wife making a will, as she told him she would do, as shown in finding No.

21, David L. Gemmel, on the 20th day of January, 1904, promised his wife, Sarah Gemmel, that he would deed to Edmond Fletcher, the plaintiff in this action, the lands he seeks to recover herein or pay him the value of said land in money; and that Mrs. Gemmel, reposing confidence in her husband, David Gemmel, that he would do as he promised her, refrained from making a will and willing said land to her stepson, Edmond C. Fletcher, plaintiff in this action.

"(23) That since the death of Mrs. Gemmel, and before the commencement of this action, plaintiff demanded of defendant that he comply with the promise made to his wife as shown in finding No. 22, and defendant refused to comply with said promise in every particular, and still refuses so to do, in violation of said agreement and promise to his wife, and in fraud of plaintiff's rights and the trust and confidence reposed in him by his wife, Sarah C. Gemmel."

Upon these facts the court entered a decree in favor of the plaintiff, ordering the defendant to convey the lands within thirty days or in default thereof that the plaintiff recover the value thereof, $10,800, with interest from the date of the decree, January 2, 1906.

The defendant brings the case here for review.

*Rossington & Smith,* and *Samuel Barnum,* for plaintiff in error.

*Beardsley, Gregory & Kirshner,* and *Ogg & Scott,* for defendant in error.

The opinion of the court was delivered by

GRAVES, J.: Numerous assignments of error are presented in the brief of plaintiff in error, but many of them relate to practically the same questions, and may be considered in groups.

It is urged that the court admitted incompetent, immaterial and hearsay testimony, which is pointed out in detail by the specifications of error. The trial court recognized the fact that evidence of this kind was in the case, and during the progress of the trial some of it was stricken out; and, as to other portions,

the statement was made by the court that it would not be considered in the determination of the action. We do not understand, however, that the admission of this class of testimony is necessarily erroneous, where the trial is by the court without a jury. In such cases it will be presumed, unless the contrary appears from the record, that the court, in reaching its conclusions, considered only such evidence as was legally admissible. (*McCready v. Crane*, 74 Kan. 710, 88 Pac. 748; *Lee v. Railway Co.*, 67 Kan. 402, 73 Pac. 110, 63 L. R. A. 271; *City of Olathe v. Cosgrove*, 71 Kan. 885, 81 Pac. 1131; *Osborne, Ex'r, v. Young*, 28 Kan. 769.)

The evidence objected to relates either to facts upon which there is unobjectionable testimony or to such as are themselves unimportant. We find nothing serious upon this subject.

The findings of fact made by the court seem to be justified by the evidence, and, no serious objection having been made to them, they will be regarded as a correct statement of the evidence given on the trial. The plaintiff insists that the defendant holds the lands in controversy under circumstances which, in law, constitute what is known as a constructive trust, of which he is the beneficiary. The facts which create this trust, when summarized, are these: The stepmother of the plaintiff, Mrs. Gemmel, had the exclusive right to purchase the land in controversy at ten dollars an acre. When the purchase was made by the defendant the land, with the improvements placed thereon by her and her former husband, was worth thirty-five dollars an acre. The defendant, who was then her husband, went to Olathe to procure a deed for her to this land. This deed, by mistake, contained his name as grantee. This was unintentional on his part, and he intended to correct the mistake by making a conveyance to her, but never did so. Several years afterward, shortly before her death, she and the defendant had a conversation in which she stated to him

that she wanted her step-son, the plaintiff, to have her land, and that she could not die easy without feeling that he would get it. It was suggested that she might give the plaintiff money then in the bank instead of the land, but she insisted that he should have the land, and stated to her husband that unless he would promise to convey the land to her step-son she would "have to make a will," to which the defendant replied, "Very well, don't worry; I will do that." Mrs. Gemmel took no step toward making a will, and died the following day. The defendant has failed and refused to make a conveyance to the plaintiff, as he promised to do.

It has been urgently insisted that these facts fail to show such fraud on the part of the defendant as is necessary to support a constructive trust. All trusts which arise by operation of law are created for the purpose of preventing the perpetration of fraud. Fraud is, therefore, an essential element of all such trusts. All mere promises to convey real estate which rest in parol are void under the statute of frauds, and, however disappointing and harmful the refusal to perform such promises may be a court of chancery cannot declare a trust thereon. The statute of frauds can only be set aside in transactions where its enforcement will permit the perpetration of that which it was intended to prevent. There is no serious disagreement among the authorities upon this subject. If there appears to be any confusion in them it arises not so much upon the legal rule as to when a trust arises as upon whether or not the facts of the given case justify this equitable intervention. In some cases it is declared that the fraud must be such as is sometimes denominated active, or actual, fraud. In other cases mere passive conduct that will result in the consummation of an unconscionable transaction, amounting simply to what is known as constructive fraud, is held to be sufficient.

In cases where a trust has resulted because of false and fraudulent representations used in obtaining a

conveyance, and the grantee affirmatively and actively induced the execution thereof, the words "actual" and "positive" frequently occur in the opinions to characterize the fraud used. And in such cases it has been said that the fraud must have been present as a producing cause of the transaction. In cases like the present, however, where the fraud is perpetrated by the refusal to consummate the transaction, it is otherwise. In this case the defendant received title to the land in controversy by mistake. He had no right or interest therein, and claimed none. He recognized at all times the ownership of his wife. The promise made to her on her death-bed was a recognition of her title at that time. By this promise to convey the land to the plaintiff he prevented her from disposing of it by will. He knew that she permitted the situation to remain as it was because of such promise. Their relationship—that of husband and wife—was confidential in the highest degree known to the law. The refusal on his part to perform this promise, thereby retaining the property as his own, is a fraud upon his dead wife, and a fraud upon the plaintiff. The transaction on its face appears innocent on the part of the defendant prior to his refusal to convey, but in the absence of any indication to the contrary it will be presumed that when he made this promise to his wife he then intended to do what he finally did do. (*Larmon et al. v. Knight et al.*, 140 Ill. 232, 29 N. E. 1116, 33 Am. St. Rep. 229.) Courts of equity do not permit persons thus to profit by their own perfidy. Justice, reason and authority concur in the conclusion that the facts here shown are sufficient to create a constructive trust, and we so find. In the case of *Ransdel v. Moore*, 153 Ind. 393, 53 N. E. 767, 53 L. R. A. 758, it was said:

"The question presented by the demurrer to the fifth paragraph of complaint is whether or not a trust can be enforced against a man who, when his wife is on her death-bed, by his promises prevents a deed or will or other writing being made by her in favor of her

brothers, and on the death of the wife the real estate intended for the brothers is inherited by said husband, he being her only heir at law.

"The rule established by the authorities is that when an heir or devisee in a will prevents the testator from providing for one for whom he would have provided but for the interference of the heir or devisee, such heir or devisee will be deemed a trustee, by operation of law, of the property, real or personal, received by him from the testator's estate, to the amount or extent that the defrauded party would have received had not the intention of the deceased been interfered with. This rule applies also when an heir prevents the making of a will or deed in favor of another, and thereby inherits the property that would otherwise have been given such other person. . . . It is not essential to the creation of such a trust that the fraud be actual, it may be actual or constructive. . . . An actual fraudulent intention on the part of the heir or devisee is not necessary to the creation of a trust of this nature. The great weight of authority in England, and in this country, in such a case is that after the death of the testator or intestate equity will convert the devisee or heir into a trustee, whether when he gave his assent he intended fraud or not; the final refusal of himself, if living, or if dead, of his heirs or devisees, to execute such trust, having the effect to consummate the fraud . . . 'And wherever property is acquired by fraud, or where, though originally acquired without fraud, it is against equity that it should be retained by the party, there equity raises a constructive trust, which is held not to be within the statute, . . . and which may be proved by parol. . . . So, . . . if a testator be induced to make a devise, by the promise of the devisee that it should be applied for the benefit of another, equity, upon these facts, would create a constructive trust, which might be established by parol.' . . . 'If one party obtains the legal title to property, not only by fraud or by violation of confidence or of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the

beneficial owner.' This has been the doctrine of the English courts for more than 200 years. . . . 'Where a person, knowing that a testator in making a disposition in his favor intends it to be applied for purposes other than his own benefit, either expressly promises, or by silence implies, that he will carry the testator's intention into effect, and the property is left to him upon the faith of that promise or undertaking, it is in effect a case of trust; and, in such a case, the court will not allow the devisee to set up the statute of frauds—or rather the statute of wills, by which the statute of frauds is now, in this respect, superseded; and for this reason: the devisee by his conduct has induced the testator to leave him the property.' . . . 'If an individual on his death-bed, or at any other time, is persuaded by his heir at law, or his next of kin, to abstain from making a will, or if the same individual, having made a will, communicates the disposition to the person on the face of the will benefited by that disposition, but, at the same time, says to him that he has a purpose to answer which he has not expressed in the will, but which he depends on the disponee to carry into effect, and the disponee assents to it, either expressly or by any mode of action which the disponee knows must give to the testator the impression and belief that he fully assents to the request, then, undoubtedly, the heir at law in the one case, and the disponee in the other, will be converted into trustees, simply on the principle that an individual shall not be benefited by his own personal fraud.' . . . After a testatrix had given all of her estate to the defendant she changed her mind and wanted so to alter her will as to give plaintiff her half of certain real estate, whereupon defendant said to her: 'You are weak and need not execute a codicil in order to give plaintiff what you desire; let the will stand, and I will deed this real estate to her.' Held, that the defendant held said real estate in trust for the plaintiff, and was bound to convey the same to her. . . . 'We do not mean, however, that it is essential to the upholding of such a trust that a devisee should have been an active agent in procuring the devise to be made in his favor, for the great current of English authority during the last two centuries, as well as that of this country, holds that, if either before or after the making of the will the testator makes known to the devisee his desire

that the property shall be disposed of in a certain legal manner other than that mentioned in the will, and that he relies upon the devisee to carry it into effect, and the latter by any words or acts calculated to, and which he knows do in fact, cause the testator to believe that the devisee fully assents thereto, and in consequence thereof the devise is made, but after the decease of the testator the devisee refuses to perform his agreement, equity will decree a trust and convert the devisee into a trustee, whether, when he gave his assent, he intended a fraud or not—the final refusal having the effect of consummating the fraud.' " (Pages 407-417.)

In the case of *Brook and others v. Chappell*, 34 Wis. 405, which was a case to require a legatee in a will to perform oral directions of the testator, it was said:

"In every case where one induces the testator to omit a provision in a will on behalf of another, by assurances that he, being the heir, or personal representative, or residuary legatee, will see such person paid such legacy or other provision, it is treated as an estoppel upon the party, or a virtual fraud to refuse performance, whereby a legal duty is imposed, and it will be enforced in a court of equity." (Page 414.)

In the case of *Larmon et al. v. Knight et al.*, 140 Ill. 232, 29 N. E. 1116, 33 Am. St. Rep. 232, it was said:

" 'Where a person by means of his promise, or otherwise by his general conduct, prevents the execution of a deed or will in favor of a third party with a view to his own benefit, that is clearly within the first head of frauds, as distinguished by Lord Hardwicke, viz., that arising from facts or circumstances of imposition; and the person so acting may be decreed to be a trustee for the injured party, to the extent of the interest of which he has been thus defrauded.' . . . It would seem to be equally within the principle for a person, by means of his promises, to induce a party not to let real estate descend as it would otherwise have been left by him to descend, for the injury, in the case mentioned, to the legatee or grantee cannot be different or greater than is the injury to the heir, if he is, by like means, deprived of what would otherwise have been his inheritance. . . . It was not indispensa-

ble, here, to prove that the husband, when he had the wife's title put in his name, told anybody that he did not intend to keep his promise. That may be inferred from the circumstance that he did not comply with his promise, although there was nothing intervening to prevent it. He is presumed to have intended to do, when he obtained the property, what he finally did do." (Pages 236, 237.)

And in the same opinion the following statement from section 1055 of the first edition of Pomeroy's Equity Jurisprudence is quoted, at page 236:

"A second well-settled and even common form of trusts *ex maleficio* occurs whenever a person acquires the legal title to land or other property by means of an intentionally false and fraudulent verbal promise to hold the same for a certain specified purpose—as, for example, a promise to convey the land to a designated individual, or to reconvey it to the grantor, and the like—and, having thus fraudulently obtained the title, he retains, uses, and claims the property as absolutely his own, so that the whole transaction by means of which the ownership is obtained is in fact a scheme of actual deceit."

In the case of *Kimball v. Tripp*, 136 Cal. 631, 69 Pac. 428, it was said:

"The position of the appellant on this point is that as there was no fraud in the procurement of the conveyances the plaintiff can have no relief. But, assuming the absence of fraud (though, in view of the defendant's relation to the grantor as her agent, this can hardly be assumed), it does not follow that equity cannot afford relief. The deeds, it is found, were made to the defendant simply as her agent, and were therefore taken by him in trust for her; and, though the trust was not expressed in writing, equity will not permit the defendant to convert the property to his own use, contrary to the intention of the parties and to the confidence reposed in him. 'The doctrine is both novel and startling which restricts, in matters of fraud, its jurisdiction over the operation of written instruments to those cases where the fraud has been committed in their creation. If maintained, it will sweep away its heretofore admitted jurisdiction in an

infinite variety of cases, of almost daily occurrence, where the fraud alleged consists in the use of instruments entered into upon a mutual confidence between the parties. Fraud in their use is as much a ground for the interposition of equity as fraud in their creation. There is no distinction in the principle upon which the jurisdiction is asserted in the two cases. In both there is the same abuse of confidence, and from both the same injury results.' " (Page 634.)

In the case of *Glass v. Hulbert*, 102 Mass. 24, 3 Am. Rep. 431, it was said:

"It is not that deceit, misrepresentation or fraud, of itself, entitles a party to an equitable remedy; but that equity will interfere to prevent the accomplishment of the fraud which would result from the enforcement of legal rights contrary to the real agreement of the parties. Indeed, the fraud which alone justifies this exercise of equity powers, by relief against the statute of frauds, consists in the attempt to take advantage of that which has been done in performance or upon the faith of an agreement, while repudiating its obligations under cover of the statute." (Page 39.)

In the case of *Curdy v. Berton*, 79 Cal. 420, 21 Pac. 858, 5 L. R. A. 189, it was said:

"Where a testator bequeaths property in trust to a legatee, without specifying in the will the purposes of the trust, and at the same time communicates those purposes to the legatee orally, or by unattested writings, and the legatee, either expressly or by silent acquiescence, promises to perform the trust, and the trust itself is not unlawful, there a court of equity will raise a constructive trust in favor of the beneficiaries intended by the testator, and will charge the legatee as a constructive trustee for them, upon the ground that the legatee will not be countenanced in perpetrating a fraud by encouraging the testator to make a bequest which would not otherwise have been made, and then refusing to execute his promise." (Page 423.)

In *Brook and others v. Chappell*, 34 Wis. 405, the court further said:

"Undoubtedly every part of a will must be in writing, and a naked parol declaration of trust, in respect

Gemmel v. Fletcher.

of land devised, is void. The trust insisted on here, however, owes its validity, not to the will or the declaration of the testator, but to the fraud of the devisee. It belongs to a class in which the trust arises *ex maleficio,* and in which equity turns the fraudulent procurer of the legal title into a trustee, to get at him; and there is nothing in reason or authority to forbid the raising of such a trust from the surreptitious procurement of a devise." (Page 415.)

In the case of *Ragsdale v. Ragsdale,* 68 Miss. 92, 8 South. 316, 11 L. R. A. 316, 24 Am. St. Rep. 256, it was said:

"There is no dissent in the books from the proposition that one who is *active* in preventing a testator from making an intended provision by his will for another, and where, but for such intervention, the intended provision would have been made, will be held to be a trustee of any devise to himself to the extent it would have been for such other if it had not been intercepted by him, and will be compelled to respond to the claim of the intended beneficiary. Intercepting a bounty intended for another, and diverting it to one's self, is held to be a fraud, from which a trust arises by operation of law, and not within the statute of frauds or wills, but expressly excepted.

"The facts stated in the bill show that the testator, who had procured a codicil to be prepared to change the devise made wholly to the appellant, so as to include the appellee as a sharer of the devise, was induced by representations and assurances of the appellant to forego and abandon his purpose to execute the codicil to effect the purposed change in the will, which was left as written because of such representations and assurances. Out of this transaction a trust arises by operation of law, because the testator was influenced with respect to his will, and an intended beneficiary was prevented from receiving the benefit which, but for the intervention stated, would have been secured to him by the act of the testator.

"We would not be understood as sanctioning the doctrine that an enforceable trust will arise from the mere breach of an oral promise, however solemn, to hold land in trust. There must be conduct influential in producing the result, and but for which such result

38—76 KAN.

would not have occurred, amounting, in the view of a court of equity, to fraud, to save the case from the statute of frauds. A merely oral promise, and its subsequent breach, however disappointing and harmful, and though ever so reprehensible in morals, is not of itself enough to cause a court of chancery to declare a trust." (Page 97.)

(See, also, *Meredith v. Meredith,* 150 Ind. 299, 50 N. E. 29; *Giffen et al. v. Taylor,* 139 Ind. 573, 37 N. E. 392; 2 Wash. Real Prop., 6th. ed., § 1430; *Hoge v. Hoge,* 1 Watts [Pa.], 163, 26 Am. Rep. 52; *Gilpatrick v. Glidden,* 81 Me. 137, 16 Atl. 464, 2 L. R. A. 662, 10 Am. St. Rep. 245; *Matter of Will of O'Hara,* 95 N. Y. 403, 47 Am. Rep. 53; 1 Perry, Trusts, 5th ed., §§ 181, 182.)

It is contended that the district court erred in holding that the trust covered all the property in controversy; such, it is claimed, was not the intention of Mrs. Gemmel, nor was it within the contemplation of the defendant's promise. The existence and scope of the trust depends upon the interpretation of the death-bed agreement as stated in the court's finding of fact No. 21. The language used by Mrs. Gemmel was: "David, I cannot die easy feeling that Ed will not get *my land down there* or its value in money." To the suggestion that he be given the money in the bank, she replied: "I would rather he had *my land.* . . . It was his father's, and belongs to him by rights." It is insisted that, as the north eighty had been claimed by Mrs. Gemmel as her own, and the south eighty had been regarded by her as belonging to the estate of her first husband, that the words "it was his father's" limits the application of the expression "I want him to have my land down there" to the south eighty. Her statement on this subject, standing alone, might appear doubtful, but taken in connection with the other findings and evidence it is quite easily understood.

Finding No. 6 indicates that the north eighty was acquired by Mr. and Mrs. Fletcher jointly, but in what

proportion does not appear. The evidence shows, however, that they bought some calves with money jointly furnished, which were cared for and fed there until in the spring when they were "coming two," at which time they were sold, and out of the proceeds the north eighty was purchased. After its purchase Fletcher cultivated the land and made lasting and valuable improvements thereon. It would seem, therefore, that whatever claims may have been made by Mrs. Fletcher, after her husband's death, concerning the ownership of this land, that he, at the time of his death, had a substantial equity therein. Under these circumstances it does not seem strange that, when on her death-bed, making final disposition of her estate—when considering the just claims of her step-son, and remembering the circumstances under which this land, all of it, was acquired and improved—she would say: "It was his father's, and belongs to him by rights." The defendant had enjoyed the use of this eighty for years. No reason existed why she should think that he had any claims to be considered. He was an old man, without children, with abundant means, and it would seem unnatural and unfair that he should enjoy any part of the property produced by the money and labor of Mr. Fletcher, as against the latter's only surviving child, the plaintiff.

We think it more reasonable to conclude, as the trial court did, that when she said *"my land"* she referred to all of the land in controversy, and the expression "it was his father's" was not intended to limit the land which she wanted her step-son to have. Besides, the evidence is such that we would not feel at liberty to disturb the conclusion of the court upon this point, even if we were doubtful of its propriety. We conclude that she intended Ed to have all the land in controversy.

Finally, it is claimed that, in any view, a trust could not arise which would cover any more land than Mrs.

Gemmel could have legally devised to Ed if no promise had been made by the defendant and the threatened will had been executed. In support of this contention we have been referred to the provision of the statute of wills which prohibits husband or wife from depriving the other by will of more than one-half of his or her property. (Gen. Stat. 1901, § 7972.) This law, however, has no application here. There is nothing in the record which shows that a compliance by the defendant with the promise made to his wife will deprive him of more than one-half of her property. What property she had other than this land does not appear, although the defendant probably knows. No suggestion of this kind was made when Mrs. Gemmel was insisting upon the conveyance; nor when the plaintiff demanded that the wishes of his step-mother be fulfilled; nor in the answer filed in this suit; nor does the evidence present facts from which such a conclusion can be satisfactorily drawn. This contention seems to be an afterthought. It is presented here for the first time, and for that reason cannot be considered. (*Railroad Co. v. Beets,* 75 Kan. 295, 89 Pac. 683.)

The judgment of the district court is affirmed.

OPINION DENYING A PETITION FOR A REHEARING.

(93 Pac. 339.)

The opinion of the court was delivered by

GRAVES, J.: A petition for a rehearing has been filed in this case, presenting some matters not discussed in the opinion which we deem proper to consider now. It is urged that as the undisputed evidence and the findings of the court show that David L. Gemmel paid the original purchase-price of ten dollars an acre for the lands in question, and it does not appear that he has been repaid therefor, he should at least be credited with that amount on the judgment entered against him.

As an abstract proposition this statement has great force, but as presented in this case it has another phase. The petition contains a statement of facts claimed to constitute the resulting trust sought to be enforced. The answer of David L. Gemmel rests upon the claim that he is the owner in fee of the land, and that no trust of any kind exists in relation thereto in favor of the plaintiff. No suggestion is made in it that he has equitable interests of any kind which ought to be protected. The pleadings, therefore, present no issue under which the parties were called upon to, or could properly, present testimony concerning this or any similar equity. The evidence showing payment of the purchase-price of the land by David L. Gemmel was not presented for the purpose of establishing a claim for its recovery, but it necessarily came out as a part of the history of the case.

This evidence, and the findings of the court thereon, were therefore immaterial under the issues presented by the pleadings. The plaintiff had no occasion or opportunity to show that this money had been refunded to the defendant, and in the absence of any evidence or issue upon the subject we do not feel at liberty to find that it was not, especially when the evidence offered for other purposes indicates that it may have been, and probably was, repaid.

When David L. Gemmel promised his dying wife to convey the land to the plaintiff no suggestion was made by him of any right or claim on account of this purchase-money, improvements or other equity. When, afterward, plaintiff demanded a conveyance of the land no claim was then made of this kind. And when defendant was confronted with a suit to compel performance of his promise, where he was called upon to disclose fully all the rights, legal or equitable, or both, which he claimed to have in the land, no such suggestion was made. It appears that he had means in his possession belonging to his wife, out of which he

might have paid himself; that he and his wife kept their business matters separate, and had accounts against each other. While these circumstances were not deemed sufficient to justify an affirmative finding that this money had been refunded, it indicates what the evidence might have shown if the case had been tried under proper issues. We regard these facts as a suggestion that the order here requested in behalf of the defendant as plain equity might, and probably would, be an injustice to the plaintiff.

This situation is due to the failure of the defendant, David L. Gemmel, to plead this matter so that all the facts relating thereto could be presented to the trial court and the rights of the parties intelligently determined. As the case was presented here, we felt compelled to make the order of affirmance as it now stands, and are not satisfied that justice would be subserved by any change therein.

It is urged that the plaintiff could have no standing in equity until he tendered to defendant an amount equal to the sum invested by the latter in the land. We do not understand that equity requires a tender where nothing is due. If the defendant had equities of any kind in the property in controversy he ought to have so informed the trial court and sought protection there. This court cannot consider questions outside of the pleadings and the proof and not presented by the parties to the district court.

As to the other questions presented by the petition for a rehearing, we have nothing to add to what is contained in the opinion heretofore filed. The petition for a rehearing is denied.