No. 23,056.

GLADYS YOXALL STARBUCK, *Appellant and Appellee*, v. MARY E. YOXALL KINGORE, *Appellee and Appellant*, et al.

### SYLLABUS BY THE COURT.

1. TRIAL BY THE COURT—*Admission of Incompetent Evidence—When Non-prejudicial.* Rule followed, that where a trial court is sitting without a jury the introduction of incompetent testimony is nonprejudicial if the court's findings of fact and the judgment thereon are well supported by other evidence which is competent.

2. TITLE AND OWNERSHIP—*Title to Real Estate in Husband—Purchased with Wife's Money—Wife Equitable Owner.* The evidence examined and held sufficient to support a finding and judgment that without fraudulent intent certain land contracts acquired in the name of defendant's deceased husband had been purchased with defendant's money, and that she was the equitable owner thereof, and that such lands were unaffected by the provisions of the will of the husband.

3. SAME—*Action to Set Aside Quitclaim Deed—Undue Influence—Constructive Fraud—Inadequate Consideration.* The evidence examined and held sufficient to support a finding and judgment that defendant procured a quitclaim deed to her daughter's interest in her husband's will by undue influence, constructive fraud, and for an inadequate consideration.

4. SAME—*Stipulation to Dismiss Action—Procured by Undue Influence.* The evidence and circumstances touching the plaintiff daughter's signing of a stipulation to dismiss this action examined, and *held,* that the trial court's finding that it was procured by the undue influence of the defendant mother is sustained.

5. SAME—*Value of Plaintiff's Remainder in Land—Finding Supported by Evidence.* Record examined, and held to support the trial court's finding that the plaintiff's remainder interest in the lands devised by her father (a 960-acre ranch worth in excess of $20,000), was "of large value" although no computation of its present worth based upon the comparative life-expectancies of herself and her mother who held the life estate was introduced in evidence.

Appeal from Wallace district court; ISAAC T. PURCELL, judge. Opinion filed November 4, 1922. Affirmed.

*John J. Morrissey, Charles T. Mahoney, William H. Scofield,* and *Robert H. Kane,* all of Denver, Colo., for the appellant and appellee.

*W. E. Ward,* of Sharon Springs, and *T. J. O'Donnell,* of Denver, Colo., for the appellee and appellant.

Starbuck v. Kingore.

The opinion of the court was delivered by

DAWSON, J.: This appeal and cross appeal relate to a controversy over certain Wallace county lands. The lawsuit was chiefly between an adopted daughter, Gladys Yoxall Starbuck, and her adoptive mother, Mary E. Yoxall Kingore.

It appears that the late Samuel D. Yoxall, husband of Mary and adoptive father of Gladys, at his death was the owner and held full title to 960 acres of land in Wallace county, and also held contracts for the purchase of 960 acres of Union Pacific railroad lands adjacent thereto. By the will of Samuel, a life estate in all these lands was devised to Mary, with remainder to Gladys if she survived her mother, otherwise the remainder should devolve on a nephew, Richard Yoxall.

When the will was probated, Mary asked for a determination that the land contracts had been acquired with her funds and that those land contracts equitably belonged to her. The probate court gave judgment in Mary's favor in accordance with the prayer of her petition. In time, Mary paid the balance of the purchase price of the railroad lands, but the conveyances thereto were executed to "the devisees under the last will and testament of Samuel D. Yoxall, deceased."

In July, 1915, a few months after Gladys became of age, she made a quitclaim deed to Mary covering all the Yoxall lands. There was evidence that this deed was made pursuant to an agreement between mother and daughter, during the latter's minority, the consideration (perhaps insufficient) being Mary's promise to continue Gladys's education. Gladys was married in October, 1916, and in March, 1917, this action was begun to set aside the quitclaim deed of July, 1915. Plaintiff's petition alleged undue influence, insufficient consideration, and fraud in its procurement. On June 16, Mary and Gladys entered into an agreement to dismiss this action, and a stipulation to that effect was signed by them. The consideration was to be the purchase of a house for Gladys or the payment to her of $1,000, $500 in cash and $500 when Mary should sell some property. No part of this consideration was paid. Five days later, Gladys telegraphed and wrote to her attorneys to disregard this stipulation, saying that she had signed it under Mary's influence, and requesting them to protect her rights.

All these matters, and others of less significance, are narrated in the pleadings. The trial court gave judgment in Mary's favor for the railroad lands, and set aside the quitclaim deed from Gladys to Mary.

As to the railroad lands, the trial court specially found:

"XV. . . . That . . . [the railroad lands described] . . . was all or partly purchased with money this defendant, Mary E. Yoxall Kingore, brought to her husband, Samuel D. Yoxall, at or soon after their marriage or was purchased by the said husband, Samuel D. Yoxall, for his said wife, now Mary E. Yoxall Kingore, and she having completed payments on the Union Pacific Land Company's contracts after the death of her husband, the late Samuel D. Yoxall, this land just above described, is the property of defendant, Mary E. Yoxall Kingore, absolutely, and not subject in any way to the operations of the will of the late Samuel D. Yoxall and the title to said land is hereby quieted so far as the operation of the said will under controversy exists, against all parties claiming, or hereafter to claim any right, title, in or to said land under by or through the provisions of said will of Samuel D. Yoxall, deceased."

Touching the other lands owned by Yoxall, deceased, and which were devised by his will, the court found:

"II. That Samuel D. Yoxall died on October 28, 1907, leaving a last will and testament which devised and bequeathed all of his personal property to his wife to be her absolute property, and the real estate to be hers as long as she lived, and at her death the real estate to be this plaintiff's if she was then living, and if she was not living at date of the death of this defendant, Mary E. Yoxall Kingore, then to Richard Yoxall, a nephew. . . .

"XI. That on November 28, 1914, the plaintiff herein became of legal age, viz., eighteen years of age.

"XII. On July 12, 1915, the plaintiff herein made, executed, acknowledged and delivered a quit-claim deed to the defendant herein, Mary E. Yoxall Kingore, covering all the lands owned by the said Samuel D. Yoxall at date of his death as well as those included in said land contracts; that at, and before and after the time when the deed in question was made and delivered, the relation of parent and child existed in its full vigor between the foster mother, now Mary E. Yoxall Kingore, and the foster daughter, the plaintiff herein; that the position of the foster mother was one of dominance and authority over the foster daughter and of the foster daughter of dependence upon her foster mother; that the plaintiff confided in and trusted her foster mother implicitly; that the property conveyed to the mother was of large value, exceeding twenty thousand dollars and embraced the entire estate or land of the plaintiff; that the plaintiff was without any business occupation or ability or profession, wholly unacquainted with business affairs and the forms and instrumentalities by which conveyances of property are made from one person to another; that nothing was paid nor was any binding or enforcible agreement made to pay the plaintiff for all the vast property so conveyed; that the alleged agreement to give the plaintiff an education for the land so conveyed

was made in September, 1914, when plaintiff was still a minor. Nothing in the evidence of any consideration for this deed or even a promise of a consideration went beyond what was due this plaintiff, by right from her foster mother; that of continuing her in school and music, which was settled upon before the death of her foster father, Samuel D. Yoxall. The deed was wholly void of consideration. . . .

"XIV. That on June 16, 1917, this plaintiff signed a request to the clerk of the District Court of Wallace county, Kansas, to dismiss this case; that defendant Mary E. Yoxall Kingore had repeatedly importuned the plaintiff to do so, by letter prior to said time, but was unable to secure a dismissal of this case; that she went to Montrose, Colorado, where the plaintiff was living and there by exercising parental influence and appeals to the filial duty of the plaintiff, accusations of ingratitude and other importunities induced the plaintiff to direct a dismissal of this case which she did, but promptly repudiated as soon as the parental influence was removed; that although the plaintiff was then of age and living away from her foster mother and with her own husband, still she was susceptible to the influence of her foster mother as indicated by her actions and by so holding, this bargain must fail on the same grounds as the original contract and deed."

Both parties appeal.

Examining the errors assigned by plaintiff, the first point raised by her relates to the admission in evidence of defendant's testimony touching transactions between herself and her deceased husband. The defendant testified that at the·time of her marriage to Yoxall she had $2,000. At that time, in 1885, his only property consisted of his interest as a homesteader in a quarter section of government land. Her testimony narrated at length how Yoxall and herself by their joint efforts for a long period of years accumulated the considerable estate possessed by Yoxall or by Yoxall and defendant at his death in 1907.

The testimony objected to reads:

"Do you know what use was made of that money [defendant's $2000] by Mr. Yoxall?

"Objected to as being incompetent, irrelevant and immaterial, and an offer by the defendant to testify to a transaction with a deceased person.

"By the Court: Overruled.

"A. Mr. Yoxall bought horses, sheep and implements for the ranch with this $2,000 which I loaned him.

"Q. Was that ever paid back to you in money by Mr. Yoxall? A. No.
"Objected to by the defendant for the same reason."
[Overruled.]

Elsewhere the record reads:

"At the time I loaned this money to Mr. Yoxall, I received a note for $2,000. When we were married I tore it up and burned it.

"Q. Was there any arrangement made at that time that caused you to burn up the note?

"[Counsel for plaintiff]: Objected to as calling for a transaction between the defendant and the deceased person, who is the testator.

"By the Court: Overruled; she may answer. . . .

"A. The arrangement at that time was made that we would be partners in the ranch. I had all the money that furnished the stock; Mr. Yoxall had the ranch and I had the money for the stock.

"Q. When this railroad land was bought under contract, was there any arrangement made between you and Mr. Yoxall as to whose this land should be?

"[Counsel for plaintiff]: We make the same objection.

"By the Court: She can answer it.

"A. Yes, sir.

"Q. What was the arrangement? A. The section and one-half was bought for me with my money and it was to be my land. In 1893 and 1894 we sold all of the sheep on the ranch and leased it and at that time Mr. Yoxall says: 'I consider that your money has earned you $5,000,' and I was to have this land for my money. There was nothing else said at that time concerning the matter.

"I loaned Mr. Yoxall this money in the fall of 1884 prior to our marriage October 14, 1885. When we got married I tore up the note and put it in the stove. . . . I do not know when he made the first payment on the east half of section 23 nor what the consideration was. He bought it with our partnership money. Although we became partners in the ranch nothing was said about my becoming half owner of the original southwest quarter of section 24. It was after that, I started the partnership with him by virtue of giving him this $2,000. I did not invest all of my money in sheep, he bought sheep, horses and implements. It was not then that he made the statement that my money amounted to $5,000; it was before we bought section 19. When we sold out in '93 and '94 he said my money amounted to $5,000. We sold the stock.

"He did not indicate at what rate of interest he had computed my $2,000 to make it equal $5,000. He was going to pay me back with land. He was going to buy land with that money. The first time I saw the contracts was when the land was bought. I read the contracts when they came to the house."

Doubtless much of this testimony was incompetent under section 320 of the civil code, as pertaining to transactions between the witness and a deceased person; but there was no jury to be misled thereby and the equitable claims of Mary to the railroad lands were well supported by competent testimony, and the presumption is that although a trial court sitting without a jury may permit incompetent evidence to be introduced it will not suffer its judgment to be based thereon.

In *Gemmel v. Fletcher*, 76 Kan. 577, 585, 92 Pac. 713, it was said:

"We do not understand, however, that the admission of this class of testimony is necessarily erroneous, where the trial is by the court without a jury.

In such cases it will be presumed, unless the contrary appears from the record, that the court, in reaching its conclusions, considered only such evidence as was legally admissible. (*McCready v. Crane,* 74 Kan. 710, 88 Pac. 748; *Lee v. Railway Co.,* 67 Kan. 402, 73 Pac. 110, 63 L. R. A. 271; *City of Olathe v. Cosgrove,* 71 Kan. 885, 81 Pac. 1131; *Osborne, Ex'r, v. Young,* 28 Kan. 769.)"

In *Heery v. Reed,* 80 Kan. 380, 102 Pac. 846, it was said:

"The plaintiff was not competent to testify in her action against the executor in regard to her services in nursing and caring for deceased and of other transactions had personally with deceased, but as the same facts were shown by other testimony and there was in fact no contradictory or conflicting testimony on the subjects the error in the admission of the testimony is not material." (Syl. ¶ 1.)

Here there was no lack of competent evidence. Defendant's testimony as to the financial and property status of herself and Yoxall at the time of their marriage, and as to how they both worked to accumulate the property, was competent; and eliminating the incompetent matter in Mary's evidence, the material facts were established by unassailable testimony. Thus, Welch, a neighbor, testified:

"He [Yoxall] told me that before he got married that he was going in the sheep business and that his wife had some money and that he borrowed the money off of her. He said he borrowed about $2,000 and that he had bought this contract land for her to pay back for her and the homestead belonged to the heirs. . . .

"He told how he had it divided and the land on 19 and the west half of 23 [the railroad lands] was her individual land."

Another witness, Bessie Wilder, testified:

"I visited Samuel D. Yoxall and his wife in 1909 when they were on the Big Springs ranch in Colorado. Mr. Yoxall said he was going to purchase some railroad land for my auntie—that is his wife. He said he was going to buy some land adjoining the other ranch in Kansas with my auntie's money so that she might own as much or a part of the land with him. The deal was consummated while I was there at the Big Springs ranch."

Another witness, Anna Yoxall Pehrson, testified:

"My father's name was James Yoxall. James Yoxall was a brother of Samuel D. Yoxall. When I was a young girl my father resided about five miles outside of Sharon Springs, Kansas. I know the ranch of Samuel D. Yoxall. . . . I have known that place all my life. . . . Richard Yoxall, who I heard was named in the will, was my brother. . . .

"I know the land that became a part of the Yoxall ranch, known as section 19. I don't know exactly the meaning of 'railroad land,' but I know they always called it railroad land at that time. I don't know how it came to be called railroad land. People buy this railroad land from the railroad company. I had a conversation with Samuel D. Yoxall with reference to section 19. He

told me that he had bought section 19, that was the piece of land east of the house; that he had bought it for my aunt—that was the way he said it—and was going to buy a half section west of the house, one half of section 23.

"Q. For your aunt—what aunt? A. My aunt Mary.

"Q. The defendant, Mary E. Kingore? A. Yes, sir. He was going to buy half of section 23 for my Aunt Mary Kingore, too. He said my aunt had brought the money to him when they were married, and that money was to be put into that land. He did not say when he bought section 19; he said he had bought it. The time he talked to me was about 1900. Section 19 is east of the house and section 23 is west of the house. . . . Uncle Samuel said how much money Mrs. Kingore had brought; a little over two thousand dollars."

To this testimony there should be added the evidence inherent in the fact that commencing in 1885 Yoxall had practically nothing and Mary had $2,000. In twenty-two years by their joint efforts they had accumulated 960 acres of deeded land and had railroad land contracts partially paid out for 960 acres more. That significant fact not only made it natural and probable but would justify an inference that part of this considerable estate equitably belonged to Mary, otherwise at the end of twenty-two years' labor she was worse off than when her married life with Yoxall began, while her husband had grown rich in the interval. (*Lyons v. Berlau,* 67 Kan. 426, syl. ¶ 5, 73 Pac. 52; *Scholz v. Hoth,* 94 Kan. 205, syl. ¶ 1, 146 Pac. 339; *Silvers v. Howard,* 106 Kan. 762, syl. ¶ 5, 190 Pac. 1.) It seems that this evidence supported the trial court's finding XV, and it came clearly within the statutory exception to the rule concerning resulting trusts—

"Where it shall be made to appear that by agreement and without any fraudulent intent the party to whom the conveyance was made, or in whom the title shall vest, was to hold the land or some interest therein in trust for the party paying the purchase-money or some part thereof." (Gen. Stat. 1915, § 11681; *Franklin v. Colley,* 10 Kan. 260; *Rayl v. Rayl,* 58 Kan. 585, 50 Pac. 501; *Black v. Black,* 64 Kan. 689, 68 Pac. 662; *Reemsnyder v. Reemsnyder,* 75 Kan. 565, 89 Pac. 1014; *Piper v. Piper,* 78 Kan. 82, 95 Pac. 1051; *Stevens v. Hicks,* 84 Kan. 351, 113 Pac. 1049.)

There is no error in this portion of the trial court's decree.

Turning next to the complaint involved in defendant's cross appeal the trial court set aside the quitclaim deed from the plaintiff, Gladys, to the defendant, Mary, her adoptive mother; and likewise held for naught the stipulation touching a settlement and dismissal of this action. It is difficult for an appellate court to meddle with this portion of the judgment because it is virtually foreclosed by the trial court's findings of fact, XI, XII, and XIV, quoted

above.  It cannot be denied that there was competent, substantial and sufficient testimony to support those findings, and the fact that there was also evidence to the contrary is of little consequence. (*Wood v. Davis,* 12 Kan. 575; *Kahm v. Klaus,* 64 Kan. 24, 67 Pac. 542.)

In *Lumber Co. v. Workman,* 105 Kan. 505, 508, 185 Pac. 288, it was said:

"It is needless to waste words on the elementary proposition that the findings of fact made by a trial court or jury, when supported by substantial though disputed testimony, are binding on appeal."

It is argued in effect that the value of the lands was overrated by the court, and that there was *"no evidence* as to the value of her [plaintiff's] interest in these lands."  There was no formal showing of the comparative life expectancies of the plaintiff and defendant, and the age of the mother does not appear, but she was old enough to make a second marriage in 1885 ten or eleven years before plaintiff was born.  Plaintiff's life expectancy, therefore, must be twenty or thirty years greater than her mother's, and therefore, without any mathematical computation of its present worth it was perfectly obvious that plaintiff had a very considerable interest in the lands conveyed by the quitclaim deed.

A very potent item of corroborating evidence that the stipulation for dismissal of this action was procured under the same undue influence as that which prompted the execution of the quitclaim deed inheres in the fact that as soon as plaintiff had an opportunity to escape her mother's influence and procure independent advice, she repudiated the settlement and stipulation.  The principle announced in *Smith v. McHenry,* 111 Kan. 659, 207 Pac. 1108, and in *Linn v. Blanton,* 111 Kan. 743, 208 Pac. 616, is consistent with this result, since here the testimony to which the trial court gave credence fully established fiduciary relationship, undue influence and grossly inadequate consideration.

Other matters urged upon our attention have been carefully considered but need no discussion.  The trial court's judgment gave substantial justice to both plaintiff and defendant, and neither of them has shown any plain, palpable error which would justify its disturbance.  It is therefore affirmed in all its parts.