No. 31,159.

Eva Anderson and Lenore Anderson, *Appellants*, v. J. Richard Anderson et al., *Appellees*.

(22 P. 2d 471.)

Opinion filed June 10, 1933.

*Harold W. Herrick,* of Winfield, and *George W. Wood,* of Moline, Ill., for the appellants.

*O. Renn, George Templar, W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *William E. Cunningham,* all of Arkansas City, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one by devisees under the will of James Anderson, deceased, against his son, J. Richard Anderson, and his son's wife, Jean, for possession of a tract of land, for rents and profits, and for partition. As an incident to recovery plaintiffs sought to set aside a deed of the land made by James to Richard and Jean while James was, and was known by the grantees to be, mentally incompetent to convey. One of the devisees who did not join with plaintiffs was made a defendant. Judgment was rendered for defendants on the pleadings and opening statement of counsel for plaintiffs, and plaintiffs appeal.

On February 8, 1911, James Martin, then owner of the land, conveyed it by general warranty deed to James Anderson and J. Richard Anderson, their heirs and assigns. The consideration for the conveyance was $13,000. The petition alleged that James paid $4,300, Richard paid $2,200, and the vendees gave the vendor a note secured by mortgage for $6,500. When this note fell due James paid $4,500 in cash and James and Richard paid $2,000 in cash, which they borrowed and secured by a new mortgage. This mortgage was subsequently assigned to Jean, wife of Richard, who now holds it. The indebtedness secured has not been paid and is not contested.

A preliminary question relates to quantity of interest in the land which James acquired and which he could subsequently devise. The petition alleged Richard owned a one-fifth interest and the devisees of James owned a four-fifths interest. This conclusion is derived in the following way:

There are decisions that it is presumed the grantees in a deed to

A and B and their heirs take in equal proportions. The presumption is rebuttable. If it be shown they contributed unequal amounts, another presumption arises—a presumption that they take interests in proportion to their contributions. (See *Lowell v. Lowell,* 185 Ia. 508, and cases cited in the opinion.) In this instance a total of $11,000 was paid in money on the purchase price of the land. At the time of purchase James paid $4,300. Afterwards he paid $4,500 on the mortgage, making $8,800 in all. Richard paid $2,200 at the time of purchase and has paid no more. Therefore it is contended James owned four-fifths and Richard one-fifth.

The purchase-money mortgage for $6,500 was paid in full in cash on January 15, 1918. As indicated James paid $4,500. The remainder was borrowed from R. W. Tuck on a note for $2,000, signed by James and Richard and secured by a mortgage on the land in which they both joined. The question obtrudes, What interest did James have and what interest did Richard have from February 9, 1911, the date of the deed to them, until January 15, 1918?

The whole interest of vendor Martin passed from him by virtue of his warranty deed to his vendees. James paid $4,300 in cash, and Richard paid $2,200 in cash. On the theory of interest in proportion to cash contribution to price, James "presumptively" received by the deed 43/65 and Richard 22/65. Therefore, until January 15, 1918, James and Richard "presumptively" owned in approximately the proportion of two-thirds to James and one-third to Richard.

On plaintiffs' theory on January 18, 1918, something happened to ownership of the land. James and Richard took up the $6,500 mortgage. James paid $4,500 in cash. So, "presumptively" James' share rose to four-fifths and Richard's share fell to one-fifth.

The original mortgage was taken up by cash furnished by James and by cash borrowed from Tuck on a note secured by mortgage in the sum of $2,000. If when that mortgage fell due Richard had paid it, "presumptively" a $2,000 interest in the land held by James would have left him and gone to Richard.

The court cannot agree that after land has been conveyed to A and B and their heirs, quantity of interest shall be determined by subsequent contributions made through a period of years, first by one and then by the other, on presumptions bobbing up with each cash

payment, causing agile interests to hop from one coöwner to the other.

Going back to the beginning, why should interests be determined by the circumstance that one vendee paid more of the cash part of the consideration than the other? This land was not purchased for cash. One-half of the consideration was paid to vendor Martin by the joint note of James and Richard for $6,500 secured by their joint mortgage of the land. Under the law of this state, each maker of the note was severally liable for the full amount. By signing the note, Richard contributed just as much to $6,500 of the consideration as James contributed. If one subsequently paid the note or paid more than half the note, he might claim contribution from his comaker, but, as indicated, it overworks the fiction called "presumption" to say ownership was changed.

Adopting the theory of interest in proportion to contribution, by means of the joint note and mortgage for half the consideration James and Richard each bought a one-fourth interest in the land. Adding this to the proportion each obtained by the unequal cash payments, James got a total of 151/260 interest and Richard got 109/260. The same result would follow if, instead of giving the mortgage, each purchaser had paid $3,250 more in cash than he did pay. Such a result would have, without doubt, been very astonishing to James and Richard when, manifestly, all that happened was they bought a farm together, and James, having more ready cash than Richard, advanced the larger portion of the cash payment.

Proof of the fact that at the time of purchase vendees contributed unequal sums in cash is not proof that they took or intended to take in that proportion. The proof merely shows one paid more cash than the other. For example, land is deeded to A and B and their heirs and assigns. In the deed they assume and agree to pay a mortgage already on the land securing payment of a large sum. The vendor has only a small equity in the land. Besides assuming the first mortgage, the vendees give a note secured by a second mortgage for part of the consideration and pay the remainder, a small sum, in cash in unequal proportions. Inequality of the cash contribution is purely adventitious, means nothing with respect to what interests the grantees take, and imposition of a presumption they take in unequal proportions is arbitrary and unwarranted.

This is not an equitable action for an accounting and final set-

tlement of business affairs between James and Richard in which the court might, if deemed necessary or proper, secure any balance due James by a lien on Richard's interest in the land. The land was purchased in 1911. James lived seventeen years after the purchase. An accounting between James and Richard for what occurred in 1911 was legally barred by the statute of limitations, was stale in equity, and the action was one of ejectment brought by purchasers from James, taking by will, to establish and recover the share of the land James acquired by the deed to himself and Richard.

As a matter of fact, there is neither necessity nor basis for invention of a "presumption" respecting what interests the deed to James and Richard conveyed. The deed was a written instrument manifesting the intention of the parties. Its interpretation was a matter for the court. When interpreted the deed had an effect pronounced by law. The instrument made no discrimination between James and Richard, and the legal effect was they took equal interests.

If James and Richard had executed an agreement in writing that, notwithstanding the terms of the deed, they should hold in unequal proportions, that agreement would, of course, control. Otherwise James could establish a larger interest than Richard only pursuant to the statute of trusts. If James paid all the consideration and took title in Richard, no use or trust would result in favor of James, but title would vest in Richard. (R. S. 67-406.) Title having been taken in James and Richard, Richard would not, without more, hold his undivided one-half interest in trust for James for the excess of James' advancement, but title would vest in James and Richard in equal proportions. However, it might be shown that, by agreement made without fraudulent intent, one held an interest in the land in trust for the other who paid a larger part of the consideration. (R. S. 67-408.) Without such an agreement no trust arises when one of two grantees pays more than one-half of the consideration for the conveyance.

"An allegation that one spouse contributed almost the entire purchase price of a tract of real estate which was taken in the name of both of them is not sufficient to create a trust in the real estate in favor of the spouse who contributed most of the purchase price in the absence of an allegation that there was an agreement that the one who contributed the least should hold this undivided one-half in trust for the other." (*Pricer v. Simonton,* 134 Kan. 211, 5 P. 2d 835, syl. ¶ 3.)

In this instance, the petition was amended several times. The last

amendment was that there was an unwritten agreement between James and Richard that they should be seized in proportion to the amount of the purchase price each paid. Omission of an allegation that the agreement was made without fraudulent intent was fatal. (*Garten v. Trobridge,* 80 Kan. 720, 723, 104 Pac. 1067.)

The result of the foregoing is that James' will disposed of a one-half interest in the land.

On July 20, 1927, James Anderson executed an elaborate contract whereby he agreed with Richard and Jean to convey the land to them. On the very same day James did execute a deed of the land to Richard and Jean. Evidently the purpose of the contract was to provide written evidence of the consideration for the deed, and the contract summarized obligations of James to Richard and Jean which on execution of the deed were canceled, as follows:

"Money paid on notes and obligations of James Anderson............ $1,400
Borrowed by James Anderson from defendant Jean Anderson........ 1,500
One-half of the Tuck note and mortgage........................... 1,000
Board, care and medical attention furnished by defendants to said
    James Anderson, during the prior years......................... 2,500"

A further consideration for the deed was that Richard and Jean would furnish James with board, lodging and medical attention for the remainder of his life. The contract was careful to provide that if it should be unenforceable in whole or in part the satisfied obligation should revive.

The deed was filed on July 21, 1927. On October 3, 1927, Richard filed in the probate court an affidavit of lunacy stating that his father was insane and unsafe to be at large. On October 12, examining physicians filed a report stating that James was past ninety years of age and was insane, was not conscious of his surroundings, was unable to recognize relatives, that he suffered from delusions and hallucinations, and that he had shown disposition to injure Jean. The report further stated that the cause of the mental condition was senility, that the condition was of two years' duration dating from the first manifestation, that the manifestation was general and gradual, and that the disability was increasing. On October 12 the probate judge approved the medical certificate of insanity.

James died on September 12, 1928. His will, made January 31, 1924, was probated on February 1, 1931. The will disposed of the testator's estate as follows: One-tenth to his niece Helen Anderson, daughter of his son J. R. Anderson; one-tenth to his niece Leonore

Anderson, daughter of his son Victor C. Anderson; and eight-tenths to Eva Anderson, widow of his son Victor.

The action of ejectment and to set aside the deed of July 22, 1927, to Richard and Jean, was commenced on April 28, 1931, by Eva Anderson and Leonore Anderson. The petition alleged that James' mind commenced to deteriorate in September, 1924, and continued gradually to deteriorate and weaken until his death; that on July 20, 1927, James was weak mentally and physically and wholly unable to comprehend any business transaction or its import; and that he was wholly unable understandingly to enter into any business transaction or to have or to assert any will of his own. The petition further alleged that the recitations of the contract accompanying the deed were untrue and were known by Richard and Jean to be untrue, and that when the contract was signed they knew James did not have sufficient mental capacity to comprehend or understand its meaning. The petition further alleged that in 1925 James went to live with Richard and Jean and continued to live with them until about October 3, 1927; and that by undue influence and by reason of the weakened mental condition of James, which was well known to Richard and Jean, they secured execution of the contract and deed. The petition further alleged there was no adequate consideration for the deed and that Richard and Jean took advantage of James' weak mental and physical condition to procure the deed without adequate consideration and by means of the contract and deed deprived him of his property.

Defendants construe the cause of action to set aside the deed as based on fraud and undue influence in the nature of fraud. Undue influence consists of undue means of overcoming the will of a person having mind and will to be overcome. Fraud consists in deluding a person having mind and will to be moved by corrupt means. The petition charged that James did not have mental capacity to understand the nature of any business transaction or to comprehend the nature of the transaction in which he did engage. Whatever influence there was consisted in getting signatures affixed without James knowing what he was doing. Whatever fraud there was consisted in tricking James into doing something about which he had no comprehension. Therefore, the gravamen of this feature of the action was total lack of mental capacity necessary to a valid act.

The parties debate the question whether the deed was void or was voidable only, and debate the consequences flowing from de-

termination of that question. When a man who knows another to be insane sets about getting a deed from the insane person of the insane person's land, and succeeds, the court takes the land away from the clever person and restores it to the insane person's estate. Rescission as in cases of fraud is not required, and no statute of limitations commences to run against the insane person. So it may be said a deed procured under the circumstances stated is void, and devisees under the will of the insane person, made before the conveyance and while he was competent to make a will, are proper persons to bring an action to determine what appears to be an adverse interest created by the deed. (*Waller v. Julius*, 68 Kan. 314, 74 Pac. 157; *Hospital Co. v. Philippi*, 82 Kan. 64, 107 Pac. 530; *Jenkins v. Jenkins*, 94 Kan. 263, 146 Pac. 414; *Keefe v. Kill*, 135 Kan. 15, 9 P. 2d 640.)

The judgment of the district court is reversed, and the cause is remanded for trial in accordance with the views expressed in this opinion.