No. 37,026

In re Estate of John W. Gereke, Deceased (MARY E. GEREKE, *Appellant*, v. THE PEOPLES BANK, of Pratt, Executor of the will of John W. Gereke, Deceased, KAREN LANGFORD, a Minor, and GEORGE BARRETT, Guardian *ad litem* for Karen Langford, *Appellees*).

(195 P. 2d 323)

250

Opinion filed June 12, 1948.

*W. L. Cunningham,* of Arkansas City, argued the cause, and *D. Arthur Walker, Wm. E.. Cunningham* and *William R. Howard,* all of Arkansas City, were with him on the briefs for the appellant.

*George Barrett,* of Pratt, argued the cause and was on the briefs for the appellees.

The opinion of the court was delivered by

THIELE, J.: This appeal involves the validity of the will of John W. Gereke, and of a claim by his widow against his estate.

John W. Gereke was a farmer living in Pratt county. He died May 26, 1946, survived by his widow Mary E. Gereke, his daughter Vada Langford, and his granddaughter Karen, who is the daughter of Vada. Generally the parties will be referred to hereafter by their Christian names.

Under date of April 14, 1945, John executed his last will and

testament. In a summary way it may be said he gave all of the furniture, household equipment in their dwelling, as well as his automobile, to his wife Mary. All the rest of his property of every kind and description, real and personal, and none of which was further described, he gave to Mary and The Peoples Bank, Pratt, Kan., in trust. The powers of the trustees are set out at length, but as the same are not involved in this appeal, they need not be detailed, further than to say the trustees were directed to pay the net income from the trust estate to Mary as long as she should live and she was directed to use part of the income for the care and maintenance of Vada and Karen. Upon the death of Mary the income was to be paid in equal shares to Vada and Karen. Upon the death of Vada the trust was to cease as to that share and it was to be conveyed to the then surviving children of his brothers George Gereke and Will Gereke. Upon the death of Karen the trust was to cease as to that share and it was to be conveyed to the children of her body then surviving, and if there were none, then to the surviving children of his two brothers above named. He appointed his wife and the above named bank as executors.

After the death of John, The Peoples Bank filed its petition in the probate court of Pratt county to have his will admitted to probate. To this petition Mary filed her written defenses and objections, alleging that at the time the will was executed John was of unsound mind; that the will was procured through fraud and undue influence; that the alleged will was contrary to law, showed on its face that it was illegal, in conflict with law and unenforceable and void; that the will was invalid and unenforceable for the reason that it was made in violation of an oral agreement between John and Mary made long prior thereto, in which they agreed not to make wills and that their property should descend under the laws of Kansas; that she had carried out the agreement on her part and had not and would not make any will; that John's will was in violation of the agreement and she demanded that the agreement be enforced against John and his estate. Mary further alleged that John, by his will, endeavored to dispose of property belonging to Mary; that all of the property, the record title of which stood in his name in truth and in fact belonged to them jointly and she was the owner of an undivided half thereof. A long statement of reasons for the conclusion stated is later mentioned in connection with her claim against the estate. Mary also included in her defenses

and objections an allegation that she elected to take under the law of Kansas and not under the will.

As the result of a hearing in the probate court on the petition to probate the will and the defenses and objections, that court, on December 14, 1946, ordered the will admitted to probate. From that order Mary appealed to the district court.

On January 6, 1947, Mary filed in the probate court her verified petition for allowance of her claim against John's estate. The gist of this petition is that for many years prior to and at his death, John and Mary were joint owners in and to all real and personal property owned or which stood in the name of either of them, and that John, by his will, attempted to create a trust in property which he did not own. Then follows a long statement of what might be called evidentiary matter, leading to an allegation that, by reason of agreement made without fraudulent intent, John held one-half of the property standing in his name in trust for Mary, and she asked that such a trust be adjudged and enforced. Mary further alleged an agreement between John and her that neither should make a will but would permit all of their property to descend according to the statutes of Kansas, that she has fully performed, and the agreement should be enforced. Mary further alleged that her election to take under the law and John's failure to know and understand the nature and extent of his estate, which was over seventy-five percent less than he believed, effectually destroyed the manifest intention and purpose of John in executing his alleged will. On the same day the above petition was filed, Mary also filed her verified petition to have her petition for the allowance of her claim certified to the district court for hearing and determination, and on the same day the probate court made an order to that effect.

On May 19, 1947, the matters came on for hearing in the district court and over the objection of the proponent of the will, the court consolidated the trials of the appeal and of the certified claim. After a full hearing, the district court found that the will should be admitted to probate and that Mary's claim should be denied, and it entered judgment accordingly. Mary's motion for a new trial was denied and she perfected her appeal to this court.

The remarks of the trial court in deciding the case were transcribed and are set forth in the abstract. Although further reference thereto will be made later, it may be said the trial court stated the

evidence was insufficient for it to find that John Gereke was incompetent; that there was evidence of incompetency almost a year after he made his will, but that the evidence was that he was competent when the will was made; that complaint John didn't know the objects of his bounty was unfounded; that when John died, two quarters of land stood in the name of Mary and the remainder in John; that it found no evidence of any agreement that the property standing in the name of either John or Mary should belong to both in equal shares, nor that John held title for Mary; that it could not find an agreement between John and Mary not to make a will, and if there was any evidence as to such an agreement, it could not find any consideration for such an agreement. In ruling on the motion for a new trial, the court again repeated its opinion there was no agreement for a trust relation between John and Mary as to lands standing in the name of either.

Appellant has filed an exhaustive brief in which, under four general headings, she presents her contentions based on the errors as specified in her abstract. These will be treated, but not in the order presented. She directs our attention to many decisions from this and other courts and to quotations from legal texts and encyclopedias. Much of this cited material is cumulative in character or, in view of our conclusions, not presently important, and specific reference will not be made to each decision and text cited.

I

Under one heading appellant argues that John's will should be denied probate and set aside because: (1) John and Mary agreed that neither should make a will. (2) The plan and purpose of the testator has been destroyed. (3) The testator was not mentally competent. These will be treated in inverse order.

Appellant recognizes that this court has laid down the rule that the test of competency to make a will is that the testator know and understand what property he has, know about his relatives and others who may be the objects of his bounty and be able to direct and make disposition of his property with understanding and reason, citing *Klose v. Collins*, 137 Kan. 321, syl. ¶ 3, 20 P. 2d 494. In that case may be found citations of numerous authorities to the same effect. Later decisions adhering to the rule include *Bradley v. Hill*, 141 Kan. 602, 42 P. 2d 580; *Anderson v. Anderson*, 147 Kan. 273, 76 P. 2d 825; *Kunkle v. Urbansky*, 153 Kan. 117, 109 P. 2d 71. At

the oral argument, appellant conceded that there was evidence which warranted the court in finding the testator competent, but in her brief our attention is directed to evidence from which a contrary conclusion might have been drawn. No purpose will be served by detailing any of this evidence, most of which pertains to the testator's mental condition some weeks and months after the will was made. Appellant stresses a claim there was no evidence that the testator read his will nor that any person read it to him, which contention, under all of the evidence, we do not believe can be sustained. The will was dictated in John's presence and there is no claim it was not properly reduced to writing—the evidence is that it was. With characteristic industry, appellant has found and directs our attention to *In re Nolan's Estate*, 25 Cal. App. (2d) 738, 78 P. 2d 456, holding that nephews, nieces and collateral heirs are not, because of such relationship alone, natural or normal objects of bounty, and argues that John's ultimate gift to his nephews and nieces shows that he did not know the objects of his bounty. Had John ignored his wife, his daughter and his granddaughter, the argument would be very persuasive—under the circumstances it is entitled to little or no weight. There is also some argument that John did not know the effect of the will on the rights of his wife. This argument seems to be predicated in part on the assumption that Mary had successfully upheld her contention that half of the property was held in trust for her, and that John did not take that into account in making his will. As has been noted, the will was dictated in John's presence, after consultation with his attorney, and after being reduced to writing was executed in the manner provided by statute. Although necessarily stated at some length the will is simple in its provisions. There is no evidence from which it may be inferred that John did not know fully the disposition made of his property by his will. In many of our decisions dealing with wills and the competency of the testator, it has been held that we are concerned only with evidence which supports or tends to support the findings of the trier of the facts. (See, *e. g., In re Estate of Walker*, 160 Kan. 461, 163 P. 2d 359, and cases cited.)

We have examined the evidence with that rule in mind and conclude that the trial court's finding that testator had testamentary capacity must be sustained.

Appellant's contention that the plan and purpose of the testator

as outlined in his will has been destroyed will be discussed at a later place herein.

Appellant, in connection with her contention that John and Mary had agreed not to make a will, directs our attention to the testimony of one disinterested witness that John told him that he and Mary had agreed not to make wills, to that of another witness that he said he was not going to make a will, and to that of Mary that John said he could see no reason for a will "so we agreed there would be no will" and that she had made no will. The daughter Vada testified that "mother, father and I" talked it over that we would never make a will. In support of a contention such an agreement, if proved, is enforceable, appellant directs our attention to *Braden v. Neal*, 132 Kan. 387, 295 Pac. 678, where the court considered a demurrer to a pleading. There it appears that a husband and wife who had no children made an agreement that while both lived neither would make a will and that the survivor would then make a will dividing the property among the collateral heirs of each. The husband died without leaving a will. The widow made a will which violated the contract and the action was to enforce the contract. It may be observed an executed contract not to make a will was under consideration there. Appellant directs attention to *Gibbs v. Central Surety & Ins. Corp.*, 163 Kan. 252, 181 P. 2d 498, dealing with uncontradicted testimony; and argues that because no witness denied the testimony concerning the agreement not to make a will, that the agreement must stand and must be enforced. Under the circumstances the court had the duty to consider the source of the testimony, the interest of the witnesses in the outcome and also what was done. It could take into account that John had said to one witness that he had agreed not to make a will, to another that he was not going to make a will; not that he had agreed not to, the interest of Mary and Vada, the fact that no one fixed any time such a purported agreement was made, the testimony that John did make a will when his health began to fail and he wanted to make an arrangement of his affairs so that his family would be protected. In such a situation the court stated it could not find there was an agreement between John and Mary. We are hardly warranted in reviewing this same evidence and surrounding circumstances and making a contrary finding. The matter is not to be determined under *Braden v. Neal*, supra. It may also be observed that Mary, the only adverse party, and who would have inherited

only one-half of his estate had he died intestate, having elected to take under the law, is not concerned with whether John did or did not make a will, for in such case she has no concern with the portion which she does not take. (G. S. 1947 Supp. 59-603.) The contention the court erred in respect to any agreement not to make a will is not sustained.

## II

In her brief, appellant first contends that Mary and John were each the owner of an undivided one-half of all property, regardless of the one in whose name the legal title was taken, a contention later discussed, and she then contends that having filed a verified demand, which she supported by evidence, and to which demand no written objections or denials were filed and no disputing evidence offered, her claim should have been allowed. Her argument, however, turns principally on the proposition no written objections or defenses were filed in opposition to her claim, and a lengthy argument follows concerning the necessity of filing written defenses, and the necessity of denying under oath a verified claim. Appellees object to any consideration of the contention for the reason the question was never raised in the trial court. The record as abstracted does not disclose the question was ever raised in the trial court or ruled on by it. Under such circumstances it ought not be considered here. (*Herd v. Chambers,* 155 Kan. 55, syl. ¶ 3, 122 P. 2d 734.) We do note, however, that on the day the claim was filed, on claimant's petition it was certified to the district court for trial. Even if the executor had notice, he had no opportunity to file a defense. The question not being raised in the district court, the executor did not ask for permission to file any defenses, as he had a right to do (G. S. 1947 Supp. 59-2408). The matter, having been certified, was tried as though originally filed in the district court (G. S. 1947 Supp. 59-2402). In that court, as will be shown later, a considerable amount of testimony was adduced by the claimant, an utterly useless proceeding if she was entitled to judgment on the pleadings, and the matter proceeded to final judgment without any question being raised in the trial court that the executor was in default of a written defense or had failed to deny any allegations under oath. Appellant's claim comes too late and error cannot be predicated upon it. (See *Collis v. Kraft,* 118 Kan. 531, syl. ¶ 1, 235 Pac. 862, and *Koury v. Rapalino,* 124 Kan. 582, syl. ¶ 2, 261 Pac. 578.)

## III

Appellant's principal contention is that the undisputed evidence disclosed that John and Mary were each the owner of an undivided one-half of all their property regardless of whether title was taken in the name of one or the other and that the trial court erred in not so finding. Her argument later noted is that they were partners, but if not, that John held title in trust for her. In an explanatory way it may be said that the major portion of her brief is devoted to this contention where she cites many authorities and makes extensive reference to the abstract which contains a great deal of oral testimony and many exhibits all having some connection, immediate or remote, with her claim. The abstract does not disclose just what real and personal property belonged to John's estate at his death. It does disclose that at his death John had title to over 2,000 acres of land and that Mary had title to 320 acres which included the homestead, and that all of the land was free of encumbrance.

For our purposes, a summary of the evidence discloses that John and Mary, whose ages are not shown in the abstracted record, were married in 1910. They had two children, a son who died in infancy, and a daughter, Vada, who is a beneficiary under John's will. At the time of their marriage Mary had no property and John had a contract for a quarter section of land. The terms or conditions of this contract are not disclosed. John farmed and Mary performed those acts usually done by a farmer's wife in cooking, washing and sewing for the family, raising chickens, milking cows, and selling produce therefrom. On occasions she worked in the cook shack with the harvesting outfit. There was no joint bank account —it was in John's name. Nothing is shown as to intervening years concerning the acquisition of property, nor is any land particularly identified, but under date of September 9, 1918, while Mary was in California with her mother, John wrote her a letter, the portion relied on reading as follows: "Paid all off on our land, but one quarter, and it can't be paid until June. So you see we are going over the top some of these days, and you, dear little woman, must have all the praise in my way of looking at it, for you loved me and stayed by me when everybody else turned me down." One witness testified that in 1912 he heard John say, "Mary and I, we bought—we figured on buying something"; another testified she heard John say, "I and Mary have worked awful hard for what

we have"; another said that in 1941 he heard John say that he and Mary were fifty-fifty; and another stated that John told him that Mary owned half of the property and would own three-fourths of it when he died. Mary and Vada each testified to similar statements. In the early thirties John lost all of his property, which was then quite extensive, as the result of foreclosure of mortgages, but within a few years he commenced to recover financially. He succeeded in redeeming a half section of land and took title in Mary's name and she had it at John's death. He also succeeded in making further redemptions and purchases, partly in his own name and partly in the name of one Nelson from whom he had financial assistance. Without noticing intervening matters, he had trouble with Nelson which was finally determined by a contract in which Nelson and his wife were referred to as sellers and John and his wife Mary were referred to as buyers, and under which John was to obtain title in his name to the lands now in controversy. Under the contract he was to pay Nelson over $75,000 and to raise the money he sold a residence in Wichita, the title to which was in Mary, for $5,000, mortgaged his cattle for $11,000, and borrowed $60,000 on a note signed by himself and Mary which was secured by a mortgage on the real estate he was receiving from Nelson as well as on the half section standing in Mary's name and referred to above. This transaction was completed in the spring of 1943. Between that time and May, 1945, John had considerable income and by using it and the proceeds of a tract of land he sold, he was able to pay off the mortgage indebtedness. There was also evidence of acquisition of lands prior to 1930 when John and Mary executed notes and mortgages. Although not shown definitely, the record indicates that John bought some United States bonds of undisclosed amounts payable to himself and/or to Mary. A series of United States and Kansas state income tax returns was received in evidence. Some returns were John's individually, some Mary's, and some were joint returns. In the individual returns John claimed deduction for taxes paid, but the returns as abstracted do not show on what property the taxes were levied. In Mary's individual tax returns no deduction is claimed for taxes and the only income returned was from wheat speculation. We are told that the speculation was John's and not Mary's operation.

Appellant first argues that the evidence discloses that she and John were partners and that as a partner she is the owner of one-

half of all the land and other assets of the partnership, and second, that in any event John held title to one-half in trust for her. Appellees in their brief state that the matter of partnership was not presented to or contended for in the trial court and that such a contention is raised for the first time in this court. Previously we have noted the allegations of appellant's claim as filed in the probate court, which refer only to a claim of resulting trust and not to any claim of partnership. We have also noticed the remarks of the trial court in deciding the case, and no reference is made there to any claim of partnership. In no matter has appellant challenged appellees' statement that the matter of partnership was not presented to or contended for in the trial court. The matter of partnership not being in issue under the pleadings, a subject of controversy at the trial, nor ruled upon by the trial court, is not properly before us and we shall not consider that portion of the appellant's abstract and brief. (See *Herd v. Chambers,* supra; *Gantz v. Bondurant,* 159 Kan. 389, 393, 155 P. 2d 450; *Claggett v. Claggett,* 159 Kan. 535, 538, 156 P. 2d 534; and other cases noted in West's Kansas Digest, App. & E., § 169, and Hatcher's Kansas Digest, App. & E., § 304.)

Appellant contends further, however, that, assuming there was no partnership between John and Mary, the transaction with Nelson, whereby John obtained title to the real estate standing in his name at his death, gave Mary an interest in the land and that John held a one-half interest therein in trust for her. We have heretofore reviewed the terms of the Nelson contract and the manner in which it was performed. Her argument on this phase is long and must be summarized. Its gist is that an agreement whereby one holds title to land for another need not be established by direct evidence (*Scholz v. Hoth,* 94 Kan. 205, 146 Pac. 339; *Starbuck v. Kingore,* 112 Kan. 102, 210 Pac. 930); that an agreement creating a trust may be oral and proved by the admissions of the deceased the acts of the parties and all the circumstances in connection with the transaction (*Piper v. Piper,* 78 Kan. 82, 95 Pac. 1051; *Stevens v. Hicks,* 84 Kan. 351, 353, 113 Pac. 1049); that the interest of Mary was not limited to the amount of actual cash she may have advanced, but extended to the obligation which she assumed as a part of the purchase price (*McClellan v. Beatty,* 115 Ind. App. 173, 53 N. E. 2d 1013, 1016; *Moat v. Moat,* 301 Mass. 469, 17 N. E. 2d 710; *Patrick v. McGaha,* [Texas Civ. App.] 164 S. W. 2d 236, 241; as

well as *Kull v. Pearl,* 147 Kan. 329, 76 P. 2d 790, to which reference is later made) ; that Mary, having signed the note and mortgage, her ownership was equal with John regardless of who paid most of the note (*Anderson v. Anderson,* 137 Kan. 833, 835, 22 P. 2d 471; and *Nat'l Bank v. D. W. Stanrod & Co.,* 47 Idaho 93, 272 Pac. 700, 702) ; that the law implies a trust in favor of Mary by reason of her agreement and her payment in part of the consideration (*Franklin v. Colley,* 10 Kan. 260) ; that such a trust arises by implication of law because morality, justice and fair dealing demand that the relation be established (*People's Pittsburgh Tr. Co., Applnt. v. Saupp,* 320 Pa. 138, 143, 182 A. 376, 378, 103 A. L. R. 844) and to prevent unjust enrichment (*Titus v. Titus,* 151 Kan. 824, 101 P. 2d 872), and on both phases of the last proposition our attention is also directed to Vol. 3, Scott on Trusts, pp. 2242, 2243, and 2317; that there is a confidential relation between a husband and wife (*Gemmel v. Fletcher,* 76 Kan. 577, 587, 92 Pac. 713; *Warner v. Broquet,* 54 Kan. 649, 39 Pac. 228) and is one of the elements to be considered in determining whether a trust relation existed with respect to the land (*Kull v. Pearl,* supra). Under the rules as stated, it is contended the evidence compelled a conclusion a trust relation existed and our attention is directed to the evidence as to what John had told various persons about the ownership of the property, the payment of taxes, the income tax returns, and other evidence. In her brief the summarized statements are dwelt upon at length as are some subdivisions thereunder and decisions other than those noted are cited.

Contending that the evidence is undisputed, appellant directs our especial attention to *Reemsnyder v. Reemsnyder,* 75 Kan. 565, 89 Pac. 1014, as being amply sufficient to support a judgment in her favor. In that case the court considered a demurrer to plaintiff's evidence and held the trial court erred in sustaining it. Reference is made to the long and somewhat involved statement of facts held sufficient to prove a right to relief. The principal point in that case was whether the evidence disclosed a fraudulent conveyance. The court, however, took notice that the rule that a trust in land could be created only by writing did not apply where, *by agreement,* and without fraudulent intent, the person to whom a conveyance is made is to hold the land or an interest therein in trust for the person who pays the purchase price or a part of it, citing *Rayl v. Rayl,* 58 Kan. 585, 50 Pac. 501, which it may be

said supports the rule stated. Appellant also stresses *Starbuck v. Kingore,* supra, in which the court considered ownership of a decedent's lands as between his wife and adopted daughter. Reference is made to the opinion where the facts and findings of the trial court were affirmed, it being held the evidence sustained the judgment that without fraudulent intent certain lands acquired in the name of the husband had been purchased with the wife's money and that she was the equitable owner thereof and that such lands were not affected by his will.

Our decision in *Kull v. Pearl,* supra, is referred to by appellant and appellees. Limits of space do not permit a résumé of all the facts of that case but there the claim was that land standing in the name of her husband was in fact held by him in trust for Emily Campbell. The trial court, on the basis of the evidence, held that it had been made to appear that by agreement and without fraudulent intent the husband, to whom the conveyance was made, was to hold the land in trust for his wife, who paid the consideration therefor. There the evidence disclosed, among other things, that when the conveyance was made the husband had no funds but his wife did, to make a payment of $9,000 on a consideration of $17,000, the balance being procured on a note and mortgage executed by both. Later she paid the mortgage. In that case it was recognized that whether there was an agreement to hold in trust and its terms, might be inferred from the relation of the parties, their financial means, their conduct and admissions and other circumstantial evidence, but it was held that the test of sufficiency of the proof was that it must be clear and satisfactory to the trial court. Reference is made to other opinions cited in that case in support of the holding. This court affirmed the judgment of the trial court that the husband held title in trust for his wife.

*Anderson v. Anderson,* 137 Kan. 833, 22 P. 2d 471, was an action for possession of land, for an accounting and for partition, and as an incident to set aside a certain deed made to two brothers. The case is of interest on presumptions of equal ownership and the effect of unequal contributions to the purchase price, and means which might be adopted to preserve shares proportionate to contributions. In that case it was held that the legal effect of such a conveyance (equal ownership) prevails unless the grantees enter into an agreement in writing that they hold in unequal proportions, or enter into an agreement sanctioned by the statute of trusts (R.

S. 67-401 *et seq.*). An opinion denying a rehearing is reported in 138 Kan. 77, 23 P. 2d 474, where in discussing the statute of trusts it was said that the agreement therein mentioned (R. S. 67-408) must be made when the title is taken, and that when an effective conveyance is made to A and B and their heirs, an unwritten agreement made at the time of the conveyance, without intent to defraud, that the grantees should take title in proportion to their contribution to the purchase price, did not create a trust sanctioned by the statute of trusts. The case is especially of interest here on the time an agreement must be made to be of effect·under the statute of trusts.

In the earlier case of *Clester v. Clester,* 90 Kan. 638, 135 Pac. 996, L. R. A. 1915E 648, an effort was made to have a trust declared. In that opinion it was said:

"The weakness in appellants' claim is the absence of any testimony to show an agreement at the time the conveyances were made by which Ida M. Clester was to hold the land in trust for the husband. Had there been testimony that such was the agreement, the case might be said to fall within the provisions of section 8 of the act relating to trusts and powers (Gen. Stat. 1909, § 9701), and even though the agreement had been oral it would lie within the province of equity to raise a trust to prevent a failure of justice (*Rayl v. Rayl,* 58 Kan. 585, 589, 50 Pac. 501, and cases cited in the opinion). But there was no testimony showing any promise or agreement or understanding at the time the conveyances were made that she should hold in trust for him." (l. c. 640.)

In *Pricer v. Simonton,* 134 Kan. 211, 5 P. 2d 835, the issue arose on a judgment on the pleadings. Reference to the opinion is made for the facts. The rule in *Clester v. Clester,* supra, was adhered to.

*In re Estate of Crawford,* 155 Kan. 388, 125 P. 2d 354, this court considered rulings on pleadings in an action wherein a wife sought to establish claims against her deceased husband's estate, claiming a trust by implication in her favor. Although the case is clearly distinguishable from the one now before us, we note the following:

"Appellant's second argument is that the claims are not barred because a trust relationship existed, as alleged in the petition. In the first place, no facts were alleged which would create a trust. The bare allegation of the petition that a trust was created is a mere conclusion of law and was rightly stricken from the petition. No express trust was alleged; no allegation that there was any understanding or agreement between appellant and her husband that he would hold the property or the money received in trust for her. The mere fact that she turned over property to her husband or paid bills for him was not in itself sufficient to create a trust by implication of law. (*Clester v. Clester,* 90 Kan. 638, 135 Pac. 996; *Pricer v. Simonton,* 134 Kan. 211, 5 P. 2d 835; *Fooshee v. Kasenberg,* 152 Kan. 100, 102 P. 2d 995.)" (l. c. 392.)

A recent case in which this court has considered a somewhat similar situation is *Gantz v. Bondurant,* 159 Kan. 389, 155 P. 2d 450. As originally commenced a father sought to establish a resulting trust in 400 acres of land, the title to which stood in the name of his son, who was then deceased, the father contending that a resulting trust was created by reason of the fact the father had paid the consideration for the purchase of land, under an oral agreement with the son made without fraudulent intent, that the title was to be taken in the name of the son who was to hold in trust for his father. An advisory jury found against the plaintiff's claim, the trial court approved its finding, and rendered judgment in favor of the defendant. In our opinion may be found an analysis of our statute of trusts, and comment, all the basis of our holding in paragraph one of the syllabus, which reads as follows:

"The provisions of G. S. 1935, 67-401, 67-406, and 67-408 construed, and *held,* no trust concerning lands arises by implication of law in favor of one who pays the consideration for a conveyance made to another in the absence of an agreement, without fraudulent intent, that the party to whom the conveyance is made shall hold the land or some interest therein in trust for the party paying the purchase price or some part thereof."

Attention is also directed to *In re Estate of Langdon,* this day decided (*post,* p. 267) in which the surviving husband claimed that he was the owner of one-half of certain stocks and bonds standing in the name of his deceased wife by reason of an understanding and agreement between them to that effect and under which he contributed to the purchase price. The testimony in support of the claim is set forth at length in that opinion. The trial court rendered judgment for the claimant. Answering the appellant's contentions, we said that it was true no express written agreement was shown but that was unnecessary; that such an agreement could be inferred from the conduct and actions of the parties, the relationship between them and the circumstances of the case, and such being established, that a trust in the husband's favor would be implied. The judgment was affirmed.

We shall not extend this opinion by reviewing other of our many decisions, for those reviewed or mentioned therein fairly cover the field.

For present purposes, it may be said that our statute relating to trusts and powers (G. S. 1935, ch. 67, art. 4) provides that no trust concerning lands shall be created except such as may arise by implication of law, unless in writing by the party creating the

same (67-401); that when a conveyance for a valuable considera-
tion is made to one person and the consideration paid by another,
no trust shall result in favor of the other (67-406) unless it shall
be made to appear that "by agreement and without fraudulent
intent the party to whom the conveyance was made, or in whom
the title shall vest, was to hold the land or some interest therein in
trust for the party paying the purchase money or some part thereof."
(67-408.)

Did the evidence disclose facts from which the trial court was
compelled to reach the conclusion that a trust resulted under the
above statutes or under the law? In discussing the question we
shall ignore any question of fraudulent intent for it is not con-
tended there was any.

In deciding the cause, the trial court remarked that it could not
see anything more in the case than just the natural ordinary hus-
band and wife relationship that exists in probably ninety-five per-
cent of the farm homes in the country, and that for the court to
hold that Mary now owned three-fourths of the property would
seem to mean that every farm wife in Pratt county could make
the same contention and the whole theory of husband and wife
relation and ownership of property would be upset, that the way
it was (in view of her election) Mary would get half and John
would get half and she could do as she pleased with her half. After
referring to the sum of $5,000 (evidently proceeds of the sale of the
Wichita property) the court said that under some decisions there
might be a trust to that extent but there was no agreement be-
tween John and Mary respecting a trust proposition as to the
$5,000, and that there was no understanding between them when
that property was sold and put into the Nelson land purchase.

It is clear enough that the evidence discloses no specific agree-
ment between John and Mary that if she would let him use the
$5,000 and would let her half section be included in the mortgage,
that John would hold half of the lands he was acquiring from Nel-
son in trust for her. Under many of the decisions noted it is
recognized that such an agreement may be proved by circum-
stances. Each case of this kind varies from others and to a cer-
tain extent each case above noticed was determined in view of the
evidence adduced. It is true here that the evidence concerning
the relationship between John and Mary and the manner and
means in which the Nelson transaction was carried out was un-
disputed but that does not mean that only one set of inferences

may be drawn therefrom. For instance, appellant lays weight on the fact that she was a party to the contract whereby John got title from Nelson, and argues that because she was bound by the contract, anything that John got was for her benefit. She ignores the fact that if she was to get a benefit, the contract could easily have so provided and not having done so it may be inferred there was no agreement to that effect. Where two inferences are possible, a trial court does not err simply because it makes one unfavorable to a complaining party. The trial court may also have felt that such an agreement was not consistent with the previous acts of John in handling his affairs or in permitting title to the Wichita property and to the half section in Pratt county to be vested in Mary, for one inference would be that if Mary was to be the owner, both John and Mary knew how to make it clear and that she was and did not do so.

Under decisions above noted the mere fact that Mary may have contributed to the consideration of the lands acquired from Nelson did not of itself prove a trust—it was only an element to be proved. Proof of agreement made at the time to hold in trust was essential. Under the decisions the proof must be clear and satisfactory to the trial court, not to an appellate court. Here the trial court found the proof was not clear and satisfactory and that there was no agreement for a trust. We are not at liberty to substitute our judgment for that of the trial court.

## IV

We now consider appellant's contention that the plan and purpose of the testator as outlined in his will has been destroyed. This contention seems to be based primarily on an assumption that John owned only one-half of the real estate standing in his name, and on an assumption his wife would elect to take under the will and not under the law, and that neither being the case, the will failed. The contention cannot be sustained. The first assumption is not warranted and the second does not have the effect of setting aside the will. Mary's election to take under the law and not under the will may affect the amount of property upon which the will may operate, but we can discern no other effect. See *Pittman v. Pittman,* 81 Kan. 643, 107 Pac. 235, 27 L. R. A., n. s., 602; *Allen v. Patee,* 104 Kan. 440, 179 Pac. 333; and *Tomb v. Bardo,* 153 Kan. 766, 114 P. 2d 320. The matter of Mary's being a beneficiary under the trust is now of no consequence. Her renunciation caused the gift

to her to fail at its inception. (*Kimberlin v. Hicks,* 150 Kan. 449, 453, 94 P. 2d 335; *Ward v. Ward,* 153 Kan. 222, 109 P. 2d 68; and *Tomb v. Bardo*, supra.)

### V

We notice briefly appellant's complaint that the trial court erroneously refused to admit evidence.

Mary Gereke was asked whether she knew any of John's brothers and whether they helped to accumulate the property. An objection was sustained. The record does not disclose that evidence as to what her answer would have been was offered on the hearing of a motion for a new trial, and the argument the ruling was erroneous will not be considered.

Mary was also asked about a purchase of an investment in the name of John as trustee for her, and she then offered the bond in evidence and an objection was sustained. At most, the evidence was cumulative. If there was error, it has not been made to appear that it was prejudicial.

Roy Moore was a witness for appellees and testified concerning a conversation he had with John Gereke concerning his will. On cross-examination he was asked about a written statement he had given an attorney, who was evidently acting in the interest of appellant. He admitted the signing and the matter was fully inquired into. Later the attorney was placed on the stand, gave his version, and the statement was then offered and refused. The record discloses the trial court heard the whole matter, and if it was error to refuse to admit the statement it was a harmless error.

The other claim is that the trial court erred in sustaining objections sustained to questions asked Mary as to whether John at a particular date said anything to her about making a will, or indicated he was going to have a will made. Possibly a negative answer would not have violated the statutory rule as to conversations with persons since deceased (G. S. 1935, 60-2804) and the objection was premature, but that the ruling affected the outcome of the action has not been made to appear.

### VI

Our examination of the entire record, and our consideration of appellant's contentions leads to a conclusion that the trial court's judgment should be and it is affirmed.

COWAN, J., not participating.